UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JUAN MENESES, ) | |
|    Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 20-2233 |
| ) | |
| GREGORY STUCK, et. al., ) | |
|    Defendants. ) | |

SUMMARY JUDGMENT ORDER

JAMES E. SHADID, U.S. District Judge:

This cause is before the Court for consideration of Defendants' Gregory Stuck, Charles Campbell, John Burger, and Nicklas Moody's Motion for Summary Judgment. [39]. For the following reasons, the motion is DENIED. [39].

I. BACKGROUND

Plaintiff alleges Defendants Moody, Campbell, Stuck, and Burger violated his constitutional rights at Danville Correctional Center. Plaintiff claims the Defendants retaliated against him in June of 2018 for his refusal to provide information during an investigation by placing him in segregation under investigative status, terminating his employment, and transferring him to another institution.

The briefing provided in this case is concerning. The Defendants' initial attorney, an Assistant Illinois Attorney, filed the pending Motion for Summary Judgment. In this document, the Defendants claimed Plaintiff and the seven other inmates who worked in the Graphic Design Department were all moved to investigative segregation during the relevant investigation, and all were transferred to

other facilities. (Def. Mot., [39], Ex. C, D, E, F).  The affidavits from the Defendants each pointed to sections of the Illinois Administrative Code or an Illinois Department of Corrections (IDOC) Directive as the basis for moving the inmates to segregation and the transfers. (Def. Mot., [39], Ex. C, D, E, F).

The *pro se* Plaintiff filed a response noting Defendants' affidavits were incorrect. Only three of the eight workers were placed in segregation and transferred. (Plain. Resp., [46]).

A new Assistant Attorney General was assigned to this case and filed a Motion to Withdraw the previously filed dispositive motion with leave to file a second motion for summary judgment. [48].  The Defendants noted they had discovered factual inaccuracies in the previous filing and sought leave to file a revised motion.

> The Court also finds it would be a waste of judicial resources
> to proceed with inaccurate information, and ultimately, it could
> result in further delays. However, the Court does not believe an
> additional dispositive motion is required. Defendants' filed their
> motion within the time period allowed for their reply. Therefore,
> the Court will deny the motion [48], but allow Defendants additional
> time to file a reply explaining the inaccuracy and correcting the record.
> The Court will also allow Defendants to make any revised argument
> based on the correction. The reply must be filed on or before July 25,
>  2022. In addition, due to the new information, the Court will allow
> Plaintiff to file a sur-reply on or before August 8, 2022. See July 8,
> 2022 Text Order.

The Defendants' reply therefore included new affidavits.  Defendants Moody, Campbell, Stuck, and Burger each stated three separate paragraphs in their initial affidavits "were not provided by me or based on my personal knowledge." (Def. Reply, [51], Moody Aff., p. 1; Camp. Aff., p. 1; Burger Aff., p. 1; Stuck Aff., p. 1).

2

> I signed my previously filed declaration…under the mistaken belief
> that the information provided in … my declaration was
> factually accurate and based on my previously assigned attorney's
> investigation into Plaintiff's claims. (Def. Reply, [51], Moody Aff., p. 2;
> Camp. Aff., p. 1; Stuck Aff., p. 1).

The Defendants have now corrected and agreed with Plaintiff that only three inmates, including Plaintiff, were placed in segregation, and ultimately transferred. The Defendants have also provided the specific reasons for that decision.

It is troubling to see the inaccuracies in Defendants' previous briefing and, at the least, the lack of diligence and attention to detail. Although Plaintiff is proceeding *pro se*, he correctly noted the inaccuracies, and he was given additional time to file a sur reply. The Court also notes Plaintiff's summary judgment briefing has been on point, with appropriate argument, and citation to relevant caselaw. The Court will now consider the briefing provided.

## II. FACTS

Plaintiff was incarcerated at Danville Correctional Center and worked in the Industries Department from 1999 to 2018. Defendant Campbell was a Correctional Lieutenant in the Internal Affairs Division, Defendant Burger was a Major and Shift Commander, and Defendant Stuck was a Correctional Officer. Defendant Moody was employed by the Illinois Department of Corrections (IDOC) as an Internal Security Investigator. Defendant Moody says he was based in the IDOC Investigative Unit in Danville, Illinois. (Def. Reply, [51], Moody Aff., p. 1).

In approximately May of 2018, Danville's Internal Affairs Unit began an investigation into a possible inappropriate relationship between Correctional Vocations

3

Instructor SDW and Inmate VG who both worked in Danville's Industries Graphic Design Department. (Def. Reply, [51], Moody Aff., p. 1). The investigation was subsequently transferred to the IDOC's Investigative Unit and Assigned to Defendant Moody. (Def. Reply, [51], Moody Aff., p. 1). However, Danville's Internal Affairs Officer, Defendant Campbell, assisted Moody in that investigation. (Def. Reply, [51], Moody Aff., p. 1; Camp. Aff. p. 1).

Defendant Moody and Campbell conducted various interviews including interviewing all 8 inmate who worked in the Graphic Design Department. (Def. Mot., [39], Moody Aff. p. 1 ; Camp. Aff., p. 1). Defendant Moody says they also found inappropriate pictures on Inmate VG's computer in the Graphic Design Department. (Def. Mot., [39], Moody Aff. p. 1; [39-1], p. 3, 19).

Defendants Moody and Campbell first interviewed Plaintiff on June 1, 2018. (Def. Reply, [51], Moody Aff., p. 2). Plaintiff maintains only Defendant Moody conducted the first interview. (Plain. SR, [53], p. 13). Plaintiff stated Instructor SDW was "friendly, respectful, and professional." (Def. Mot., [39], Inv. Rept, p. 5). Plaintiff told the investigators he never saw or heard anything inappropriate between the instructor and the inmate.

Plaintiff did acknowledge Inmate VG would go into Instructor SDW's office "sometimes to watch tutorials on how to compete a project and sometimes other Graphic Design Inmate Workers would be in there also." (Def. Mot., [39], UMF #5). However, Plaintiff also said there were large windows you could see through, and he

never witnessed anything inappropriate when the two were in the office. (Def. Mot., [51], Inv. Rept, p. 5).

After the interview, Danville's Internal Affairs Department received a handwritten letter from an unidentified informant on June 4, 2018. (Def. Reply, [51], Moody Aff., p. 2). The letter was addressed "To the Investigators" and noted they were on "the right track" as everyone knew about the relationship between the vocational teacher and inmate. (Def. Reply, [51], Ltr, p. 1). In particular, everyone working in Danville Industry knew it, "especially Graphic Design Inmates." (Def. Reply, [51], Ltr, p. 1).

Defendant Moody states the alleged inappropriate conduct "occurred in the L-shaped office in the Industries Graphic Design Department" and the unknown informant claimed Plaintiff and Inmate KN were "the main lookouts."[1] (Def. Reply, [51], Ltr, p. 2). The unknown inmate stated Plaintiff could see who was coming through the window at the entrance to the department and used "a code word" to warn everyone. (Def. Reply, [51], Ltr, p. 2). In addition, the letter claimed Graphic Design Inmates "are all communicating with each other at gym yard, so they could tell the same story if (they were) called for questioning." (Def. Reply, [51], Ltr, p. 2). In particular, the letter stated Plaintiff and Inmate KN had lied to investigators. (Def. Reply, [51], Ltr, p.

---

[1] The letter referred to Plaintiff as "Juanito," which Plaintiff admits was his nickname. (Def. Reply, [51], Ltr, p. 2); (Def. Mot., [39], Plain. Depo, p. 6).

Defendants Moody and Campbell then conducted a second interview with Plaintiff on the same day they received the letter. (Def. Reply, [51], Moody Aff., p. 2). Plaintiff says Defendant Moody began the second interview with a "very aggressive tone" and asked if Plaintiff had forgotten to tell them anything. (Def. Mot., [39], Plain. Depo., p. 69). Plaintiff denied he was ever a lookout and continued to maintain he did not see inappropriate conduct.

The investigator's report noted Plaintiff said Inmate VG began going into Instructor SDW's office about a month prior. Plaintiff stated he gave Inmate VG several warnings about the time he spent in the Vocational Teacher's office. For instance, Plaintiff says he warned Inmate VG "to back off because it didn't look good," "the appearance didn't look right," and to give the instructor "some space because it didn't look right with (Inmate VG) going in there." (Def. Mot., [39], UMF #6). Nonetheless, Plaintiff said he had never personally witnessed anything inappropriate. (Def. Mot., [39], Inv. Rept, p. 5).

In his response to the dispositive motion, Plaintiff explains the admonitions he gave to Inmate VG concerning the time spent in the Vocational Instructor's office were "a work-related issue having nothing to do with inappropriateness between" the two. (Plain. Resp.,[46], Plain. Aff., p. 3). Plaintiff says Inmate VG was close to his out date and he was the "go to guy" for the other inmates because he knew the most about graphic design. (Def. Mot., [39], Plain. Depo, p. 106). "So, we understood that he wanted to do the tutorials, but at the same time we needed for him to teach us." (Def. Mot., [39], Plain. Depo, p. 106). Therefore, Plaintiff says it did not look good for Inmate VG to keep

6

going in the instructor's office when the other inmate workers needed his help. (Def. Mot., [39], Plain. Depo, p. 106).

Plaintiff says Defendant Moody also asked Plaintiff during the second interview how much money he made in the Graphic Design Department and if he received good time credits. Plaintiff claims Defendant Moody then threatened Plaintiff he "would lose all of that once they spoke with" Vocational Instructor SDW. (Plain. Resp.,[46], Plain. Aff., p. 2-3). Plaintiff also alleges he was threatened with long term segregation if he did not provide more information. (Plain. Resp.,[46], Plain. Aff., p. 2-3).

Defendant Campbell asked whether Inmate VG and Vocational Instructor SDW planned to get together when Inmate VG was released from custody, but Plaintiff said he did not know. Plaintiff maintains "based on their intimidation and threats it was clear (Defendants Moody and Campbell) wanted me to follow their narrative and lie." (Plain. Resp.,[46], Plain. Aff., p. 3).

Defendant Moody believed Plaintiff gave differing accounts in his two interviews "which raised concerns regarding his truthfulness." (Def. Mot., [39], UMF #7). Plaintiff was then transferred to segregation on investigative status.

Plaintiff claims the Defendant ignores the fact that Plaintiff agreed to a Voice Stress Analysis Test after this interview which determined his answers were truthful. (Plain. Resp.,[46], Plain. Aff., p. 3);(Def. Reply, [51], Inv. Rept., p. 6).

Defendants Moody and Campbell also conducted a second interview with Inmate KN on June 4, 2018, since he was also accused of being a lookout. (Def. Reply, [51], Moody Aff., p. 3). However, none of the inmates who worked in the Graphic

7

Design Department ever admitted knowing about an inappropriate relationship between the vocational instructor and Inmate V.G.  However, Defendant Moody says the investigation "resulted in substantiated findings against (Correctional Vocations Instructor SDW) that she had engaged in inappropriate conduct." (Def. Mot., [39], Moody Aff., p. 3).

Defendant Moody and Defendant Campbell say it was their decision to issue Plaintiff an investigative report on June 4, 2018, move him to segregation, and request a transfer. (Def. Reply, [51], Moody Aff., p. 3).  Defendant Stuck was instructed to draft the investigative report which simply stated Plaintiff "was placed on Investigative Status to determine his possible involvement in an incident at this facility." (Def. Reply, [51], Camp. Aff., p. 3); (Def. Mot., [39-2] Ex. 1-D)

Defendants Moody and Campbell say the decision was made in part due to the statements Plaintiff made during the second interview which they did not believe were completely truthful and the letter sent to the Internal Affairs Unit. (Def. Reply, [51], Moody Aff., p. 3; Camp. Aff., p. 3).  Their subsequent "decision to requests a transfer for (Plaintiff) also took into consideration the safety and security of the facility, as well as the safety and security for (Plaintiff) himself." (Def. Reply, [51], Moody Aff., p. 3).  The request was approved by the Transfer Coordinator's Office, and Plaintiff was transferred on June 27, 2018. (Def. Reply, [51], Moody Aff., p. 3; Camp. Aff., p. 3).

Of the eight inmates who worked in the Graphic Design Department, three were placed in segregation under investigative status: Inmate VG, who was accused of the inappropriate relationship, and Inmates KN and Plaintiff, who were accused of being

8

lookouts. (Plain. Resp., 11], Plain. Aff., p. 2); *see also* (Def. Reply, [51], Moody Aff., p. 4). Plaintiff says the same three were the only ones transferred to other facilities. (Plain. Resp.,[46], Plain. Aff., p. 4); *see also* (Def. Reply, [51], Moody Aff., p. 4).

It does not appear that Plaintiff was ever issued a disciplinary report or found guilty of a disciplinary charge. Defendant Moody says Plaintiff initially lost good time credits which were restored, but there is no explanation for when and how this occurred. (Def. Mot., [39], Moody Aff., p. 2). Plaintiff says he lost his job when he was placed in segregation. Defendants Moody and Campbell maintain they did not decide inmate work assignments. (Def. Reply, [51], Moody Aff., p. 3; Camp. Aff., p. 3).

Defendant Burger says his only involvement in the investigation into a relationship between Inmate VG and Vocational Instructor SDW was "signing off on the placement of individuals working in the Industries Graphic Design Department on investigative status." (Def. Mot., [39], Burger Aff. p. 1; Moody Aff., p. 2). Defendant Burger says it is his understanding that the shift supervisor is required to sign off on all investigative reports submitted during their assigned shift, but he did not make the decision to issue the report or move Plaintiff to segregation. (Def. Reply [51], Burger Aff., p. 1).

Defendant Officer Stuck's only involvement was filling out the investigative report as directed. The Defendant says he did not participate in the decision to issue an investigative report or move Plaintiff to segregation. (Def. Reply, [51], Stuck Aff., p 1).

III. LEGAL STANDARD

9

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact."  Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.

## IV. ANALYSIS

Defendants Stuck, Campbell, Burger, and Moody argue Plaintiff cannot demonstrate they retaliated against him in violation of his First Amendment rights. The burden of proof in a retaliation claim "is split between the parties." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012).  A plaintiff must first demonstrate a *prime face* case of retaliation by establishing: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014).

"Once a prima facie case is established, the burden shifts to the defendant to rebut the claim." *Manuel,* 966 F.3d at 680. Defendants must demonstrate they would have taken the same action regardless of the protected activity. *Id.; see also Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011).

"If the defendants meet this burden, then the plaintiff must show that the defendants' proffered reason was pretextual—in other words, a lie—and that the real reason was retaliatory animus." *Lindell v. Kind,* 2021 WL 6137381, at *6 (E.D.Wis. Dec. 29, 2021); *see also Manuel,* 966 F.3d at 680; *Kidwell,* 679 F.3d at 964.

Defendants note the Seventh Circuit has not resolved whether a prisoner's refusal to participate in an investigation is a protected activity. *See Clark v. Reed*, 772 F. Appx. 353, 355 (7th Cir. 2019) (inmate's right to refuse to cooperate with an investigation has not been clearly established in the Seventh Circuit); *Martin v. Neal,* 2022 WL 581013, at *2 (N.D.Ind Feb 24., 2022)(same); *Arbuckle v. Wilcox*, 2021 WL 5321552, at *4 (N.D.Ill. Nov 16, 2021); *Daniels v. Seymour*, 2020 WL 5405799 (C.D. Ill.) (same).

However, Plaintiff is not claiming he refused to participate in the investigation or refused to be an informant. Plaintiff instead maintains he did cooperate, but he had no other information to provide. Plaintiff states he was truthful during both interviews, but the Defendants retaliated against him because he refused to lie in order to help their investigation.

> In an unpublished order, the Seventh Circuit Court of Appeals concluded that an inmate's refusal to cooperate with an internal investigation regarding another inmate's assault on staff was not

11

> protected speech. *Caffey v. Maue*, 679 Fed.Appx. 487 (7th Cir. 2017) (not published in Fed.Rptr). … However, in another unpublished order, the Seventh Circuit limited *Caffey* to an inmate's refusal to divulge *known* information versus an inmate not having any information to divulge. *McKinley v. Schoenbeck*, 2018 WL 1830942 (7th Cir. 2018). The *McKinley* Court reasoned that, "[t]ruthfully answering questions during an investigation, even if those answers are not what the officers want to hear, is consistent with a prison's penological objectives," and, therefore, protected speech. *McKinley*, 2018 WL 1830942 *2.

*Clark v. Reed*, 2018 WL 11307318, at *6 (C.D.Ill. May 7, 2018). Viewing the evidence in the light most favorable to the nonmovant, Plaintiff has alleged his statements were protected speech and he was placed in administrative segregation and transferred as a result.[2]

Defendants argue even if Plaintiff's statements were protected speech, the Defendants still would have placed him in administrative segregation and asked for his transfer. Defendants claim it is important to note Plaintiff denied any knowledge of inappropriate conduct in his first interview, but no action was taken. Defendants reason if their intent was to retaliate against Plaintiff for his refusal to provide information against Inmate VG, they would have sent him to investigate segregation at this point and recommended a transfer. Plaintiff admits Defendant Moody was very polite during this interview, and Plaintiff was able to return to his cell and his job in the Graphic Design Department.

---

[2] Defendants also argued they are entitled to qualified immunity due to the ambiguity concerning any constitutional right to refuse to act as a prison informant, but "[i]t is undisputed that 'truthfully answering questions during an investigation, even if those answers are not what the officers want to hear' are protected by the First Amendment." *Austin v. Spiller*, 2022 WL 4095733, at *3 (S.D.Ill. Sept 7, 2022), citing *McKinley*, 731 F. App'x 511, 514. Therefore, the qualified immunity defense fails.

However, Defendants maintain two important things happened between the two interviews. First, they received a letter from an unknown informant claiming Plaintiff was one of two main lookouts for Inmate VG and he and other inmates were actively working to undermine the investigation by coordinating the information they provided.

Plaintiff says the Defendants still have no idea who sent the letter or what motivated the inmate. In addition, Plaintiff says the letter is inadmissible hearsay which should not be considered. Plaintiff is correct, offering the statements in the letter for the truth of the matters asserted is inadmissible hearsay *See* Fed. R. Evid. 801 (defining hearsay). However, statements offered for a purpose other than to prove the truth of the matter are not hearsay. *See United States v. Norwood*, 798 F.2d 1094, 1097 (7th Cir. 1986). For instance, statements can be admissible to the extent the are offered to show the impact on the Defendants rather than whether the information was accurate. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019)(admitting statements within police report for their impact on the officer); *Shaw v. Litscher*, 715 Fed.Appx. 521, 523 (7th 2017)(statement "was offered as evidence of the defendants' reason for investigating" the property in inmate's cell.)

Second, Defendants Moody and Campbell say Plaintiff provided additional information he had not provided in his first interview. The Defendants believed this suggested Plaintiff was not truthful during the first interview, or he withheld information during the first interview. Therefore, the Defendants decided to issue an investigative report, move Plaintiff to a segregation cell, and request his transfer to another institution. The Defendants claim the decision to ask for transfer was also

13

motivated by concerns for the safety and security of the facility and Plaintiff. Defendants finally argue decisive action was necessary to stop Plaintiff from undermining the investigation.

Plaintiff says he provided more information in the second interview because there were two officers, and they asked more questions. Plaintiff also says he explained the work-related context of his admonitions to Inmate VG, but the officers did not include this in their report. Furthermore, Plaintiff says he did nothing to undermine the investigation, nor was he written a disciplinary ticket based on this claim.

The Court also notes the information provided to the Defendants in the anonymous letter stated all inmates who worked in the Graphic Design Department were attempting to coordinate their stories and lie to investigators, not just the Plaintiff.

Finally, Defendants do not explain their concerns about safety and security beyond a blanket statement.

Plaintiff claims he gave truthful answers during both interviews. Nonetheless, officers accused him of being a lookout, and when he again denied any knowledge of inappropriate behavior, he was threatened with losing his job, losing his pay, and a stay in segregation. Plaintiff continued to deny any knowledge, because Plaintiff maintains he did not have any additional knowledge to give, and he was subsequently moved to segregation.

In a similar case in the Southern District of Illinois, an inmate plaintiff also claimed he provided truthful answers during a prison investigation, but the investigators threatened him if he did not provide additional information, and when he

did not, retaliated by moving him to investigative segregation. *Austin v. Spiller*, 2022 WL 4095733, at *3 (S.D.Ill. Sept. 7, 2022).  The defendants disputed the inmate plaintiff's claims and provided a different version of events.  In particular, the Defendants alleged five different confidential informants identified the inmate as a gang leader, "and it was this information that led to (plaintiff's) discipline." *Id.*  "However, the Court will not weigh the two vastly different versions of events alleged, as this is exactly the kind of dispute over material facts that is best left for a jury." *Id.*

In this case, it is reasonable to infer Defendants Moody and Campbell were angered at Plaintiff's statements and retaliated against him with segregation, followed by a transfer.  Therefore, the Motion for Summary Judgment is denied as to Defendants Moody and Campbell. The motion is also denied as to Defendants Burger and Stark.[3]

IT IS THEREFORE ORDERED:

1) Defendants' Motion for Summary judgment is DENIED pursuant to Federal Rule of Civil Procedure 56 [39].

2)  The Court will set this matter for a telephone status hearing to set pretrial and trial dates.  The parties should also be prepared to indicate whether they have any interest in a settlement conference before the Magistrate Judge.

---

[3] While mentioning the actions of Burger and Stark in the "facts," Defendants did not argue the Defendants were not sufficiently, personally involved in the alleged retaliation and therefore Plaintiff did not respond to this argument and it cannot be considered by the Court. (Def. Mot., [39], p. 6-7); (Def. Reply., [51], p. 7-10).

Enter this 10th day of March, 2023.

                                            s/James E. Shadid

                                            _____
                                              JAMES E. SHADID
                                     UNITED STATES DISTRICT JUDGE